The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

SUMIT GARG,

Defendant.

No.  CR21-045 JCC

GOVERNMENT'S SENTENCING
MEMORANDUM

Comes now the United States of America, by and through Tessa M. Gorman, United States Attorney for the Western District of Washington, Andrew C. Friedman, Assistant United States Attorney for said District, and Anthony Teelucksingh, Senior Trial Attorney, Computer Crime & Intellectual Property Section, and files this Government's Sentencing Memorandum.

## I.   INTRODUCTION

Defendant, Sumit Garg, is before the Court for sentencing following his conviction at trial for a cyberstalking scheme unparalleled in the history of this District. Even elsewhere, it is difficult, if not impossible, to find other cyberstalking cases that involved comparable aggravating factors, including:  (1) the massive volume of stalking messages, (2) the violent nature of the threats, (3) the large number of victims, (4) the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

continued stalking even following a defendant's arrest and (temporary) jailing and the entry of protective orders protecting victims, (5) the escalation to also stalking investigating police officers and prosecutors, (6) the use of actual physical violence to coerce a co-conspirator (Garg's wife) to assist in the scheme, and (7) the extensive effort to frame victims as the supposed stalkers and to have victims themselves arrested and prosecuted.

Garg's crime was abhorrent, and calls for a lengthy prison sentence. Based upon all of the aggravating factors in the case, and after considering the relevant sentencing factors, the government recommends that the Court sentence Garg to a total term of imprisonment of 180 months (that is, 15 years). A 15-year sentence will appropriately punish Garg for his crimes. It also appears to be the only means to incapacitate Garg (who appears entirely unrepentant and incapable of acknowledging the harm he has done), to prevent him from returning to stalking for a significant period of time, and, thereby, to protect Garg's victims, as well as other possible future victims, from him.

## II.   FACTS

### A. Background

The charges against Garg stem from a scheme by Garg, assisted by Garg's wife, Lindsay Hefton, that began with stalking their former roommate, Melissa Hutchins, and that grew over time to include stalking an ever-growing circle around Hutchins, including Hutchins' friends and family, Hutchins' lawyers in protection-order litigation, an investigating police officer, and even State prosecutors.

Garg's relationship with his original victim, Melissa Hutchins, was manipulative from the start. Garg told Hutchins that he was dating Hutchins' roommate, Lindsay Hefton (i.e., that he was merely Hefton's boyfriend, rather than that they were in fact married). Based upon that deception, in late 2018, Hutchins agreed to let Garg move in with Hutchins and Hefton. And, although the relationship between Garg and Hutchins initially was fine, it deteriorated rapidly. Among other things, Garg began calling

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Hutchins nicknames and sending messages with sexual innuendo, and he started expressing inappropriate interest in her romantic life.

Garg also began to engage in angry outbursts against Hutchins. On July 2, 2018, following an argument about the division of rent in which Garg became extremely angry and that caused Hutchins to fear for her safety, Hutchins moved out of the apartment and sought a protective order against Garg. The parties resolved that litigation by agreeing to a settlement agreement under which Garg would have no contact with Hutchins for a year.

## B. Garg's Stalking of Hutchins

Garg could have left the matter there. But, instead, Garg, determined apparently to get even, began to harass Hutchins. Initially, Garg made hang-up telephone calls to Hutchins from anonymous telephone numbers. Garg created social media accounts in Hutchins' name and used those to contact Hutchins' family, friends, and co-workers, and maligned her (by, for instance, falsely claiming that she had had affairs with married co-workers). Garg also contacted charities with which Hutchins worked, maligned her to the charities, and called for the charities to cut their ties with Hutchins, *see, e.g.,* Tr. Exh. 107, which they did. And, Garg sent Hutchins emails from anonymous email accounts that contained information that made clear that he had read Hutchins' diary, and he threatened to disclose the contents of the diary, including portions containing intimate details of Hutchins' former relationships and medical history. *See, e.g.,* Tr. Exhs. 106, 110.

These actions, predictably, were extremely stressful for Hutchins. Among other things, they caused Hutchins and Gonzalez to move to an apartment in a building with security, and locked access. But, Garg did not stop there. Instead, he escalated to physical threats, including threats to rape, torture, and kill Hutchins. Hutchins tried to keep her new address secret, but Garg sent Hutchins emails that showed that he had found the address. *See, e.g.,* Tr. Exh. 111. And, on October 10, 2020, Garg drove to the apartment building to which Hutchins and Gonzalez had moved. At 7:05 p.m., Garg sent

Hutchins a series of text messages from an anonymous telephone number.  These read, in part:

> I will fuck you
>
> You fucked up bitch by filing a false domestic violence petition. I will fuck you 100 times
>
> I will get you pregnant
>
> I will have anal
>
> Your pussy is waiting for my dick

*See* Tr. Exh. 120.  Three minutes later, Garg took a photograph outside the building, then slipped into the building wearing a mask and took two more pictures of the lobby.  At 7:11 p.m., after leaving the building, Garg sent Hutchins an email message from an anonymous email account with the subject line "Hey babe," that attached the three images, *see* Tr. Exh. 127, to show Hutchins that he had been inside the lobby of her apartment building and to make his threat real.

After visiting Hutchins' lobby Garg continued his campaign, sending Hutchins nearly-nonstop threats.  For example, on October 31, 2020, Garg sent Hutchins an email saying "I'm downstairs sweetheart."  *See* Tr. Exh. 169.  This was closely followed by an email attaching one of the pictures from her lobby, with the message "[t]he rooftop is amazing.  This is where I will fuck you when we meet."  *See* Tr. Exh. 137.  And, that was

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

followed by an email with the subject line "I will first rape you and then kill you." *See* Tr. Exh. 142.

On November 1, 2020, Garg was arrested. Immediately upon his arrest, the volume of stalking emails dropped drastically, although Hefton sent sporadic emails, most at Garg's instruction, to draw suspicion away from Garg. Garg was charged with cyberstalking in King County Superior Court, and that court issued no-contact orders prohibiting Garg from having any contact, direct or indirect with Hutchins, Michael Zigler (her uncle and lawyer), and Cesar Gonzalez (her boyfriend), both of whom Garg also had begun stalking. *See* Tr. Exhs. 901, 902.

On November 13, 2020, Garg was released from custody. Neither his arrest nor the protective orders had any deterrent effect on Garg. Immediately following his release, Garg resumed stalking Hutchins. For instance, on November 15, 2020, Garg sent Hutchins an email that read, in part:

> "Spicy",
>
> Did you really think a few days in jail was going to scare me?
>
> Don't be scared. I won't kill you.
>
> It is too easy and not nearly enough punishment for your crimes.
>
> I have other ideas to take care of you.

*See* Tr. Exh. 178. This was followed by regular emails and texts threatening Hutchins including, on November 20, 2020, a series of texts from an anonymous number that read, in part:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

> Pussy cravings
>
> Anal
>
> Daddy issues
>
> I'm coming very soon
>
> You will remember my dick
>
> I'm going to ruin your pussy for other men and then dump your body in the snow

*See* Tr. Exh. 241.

As Hutchins testified at trial, she was terrified, afraid to leave her apartment, unable to sleep even there. As a result, Hutchins and Gonzalez fled to New York State on November 21, 2020, and stayed there until January 2021. But, distance was not enough to stop Garg's cyberstalking. Garg's threats and stalking continued until he was arrested again on February 26, 2021. *See, e.g,* Tr. Exh. 186 (threatening Hutchins that "[y]ou have no idea who all have been paid to play with you to prep you for my dick."); Tr. Exh. 203 (email threatening that "Sumit will now rape you and make Gonzalez watch"); Exihbit 204 (email threatening "we have a full list of all your family members, expedia colleagues, hotwire colleagues. We will harass all of them repeatedly. . . . Imagine if [Sumit] kidnaps you then rapes you and dumps you in the ocean."); Tr. Exh. 207 (email threatening that "I will not leave the states before raping you.").

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Only after Garg's transfer to federal custody did the threats stop. By that time, Hutchins had endured more than a year of stalking and received many hundred, if not thousands, of stalking emails.

### C. Garg's Stalking of Other Victims, Including Law Enforcement and Prosecutors

In addition to stalking Hutchins, Garg expanded his campaign to include an ever-expanding circle around Hutchins, comprising Hutchins' family and friends, and persons who were attempting to help Hutchins. These included five other victims who were the subject of substantive charges, namely:

- Michael Zigler, Hutchins' uncle, a lawyer who represented her in protection-order litigation;
- Cesar Gonzalez, Hutchins' boyfriend;
- Mark Blair, another lawyer who represented Hutchins in protective order litigation;
- Kailey Kang, a Seattle Police Department (SPD) detective who investigated Garg's case; and
- Gary Ernsdorff, a King County Senior Deputy Prosecuting Attorney involved in prosecuting Garg's state case.

They also included many other of Hutchins' family members and friends, other lawyers representing Hutchins, and other King County prosecutors.

Garg harassed these victims in a myriad of ways. For example, he filed a frivolous bar complaint against Michael Zigler, causing him concern about his professional license. And, Garg posted negative on-line reviews about Mark Blair's law practice. As Blair testified at trial, these reviews threatened his livelihood. Garg also made repeated threats of sexual assault and violence against not only the victims, but also their, generally female, family members. For example, on October 10, 2020, Garg sent Zigler a series of texts that read:

GOVERNMENT'S SENTENCING MEMORANDUM/GARG (No. CR21-0045 JCC) - 7

I will rape melissa

Then sarah

Then your wife

Old man you are fucked

Tr. Exh. 128.

Similarly, Garg sent Mark Blair an email threatening to "destroy your family" that included pictures of members of Blair's family, *see* Tr. Exh. 352, an email threatening sexual assault against his wife in graphic terms, *see* Tr. Exh. 359, and an email threatening his wife generally, *see* Tr. Exh. 361 (email with subject line "SARA KIM IS SO FUCKED"). Garg sent Detective Kang emails listing family members, *see* Tr. Exhs. 407, 409, emails with rascist slurs (based on Garg's mistaken assumption about Detective Kang's ethnicity), and emails making explicit threats to sexually assault her, *see* Tr. Exh. 414. And, Garg sent King Country prosecutors an email with the subject line "Judges, prosecutors, lawyers killed" that listed 30 lawyers who had been assassinated and ended with two blank spaces and the text "LEAVING 31 AND 32 BLANK FOR NOW – LET US CALL THEM TO BE DETERMINED." *See* Tr. Exh. 451.

## D. Garg's Coercion of Hefton

In addition to sending thousands of emails himself, Garg also coerced Hefton to assist in the stalking campaign. Long before Garg started stalking Hutchins, Garg had been engaged in domestic violence against Hefton. And, as Hefton testified at trial, she assisted Garg in the stalking campaign because she understood that, if she did not do so, Garg would engage in further physical violence against her. In addition to this general understanding, which generally was sufficient to compel Hefton's compliance, Hefton testified that, in at least one instance, Garg directly threatened her with physical violence if she did not assist him in the stalking.

As a result, Hefton assisted Garg in various ways. For example, as described in greater detail in Part I.E *infra*, Hefton assisted Garg in his efforts to frame Hutchins and Gonzalez as the "true stalker(s)" by filing false police reports and a fraudulent lawsuit against Hutchins. Hefton also allowed Garg to use a computer that had been provided to her by her employer, Amazon, to send stalking emails. She installed software for a virtual private network on the computer to help Garg send stalking emails anonymously. And, Hefton herself sent a limited number of stalking emails during two periods in which Garg was in State custody (November 1-13, 2020, and February 25 - March 8, 2021) to make it appear that Garg could not be the person responsible for stalking.

Hefton sent the first few emails that she sent, on November 1, 2020, immediately following Garg's first arrest, of her own volition. But, she sent subsequent emails at Garg's direction. For instance, in one call from the King County Jail, Garg told Hefton to "[c]ontinue the messages." *See* Tr. Exhs. 529, 530. Based on this, Hefton continued to send stalking emails. And, after Garg had been released from King County Jail, Garg instructed her that, if anything happened to him (i.e., if he were again incarcerated), she should continue to send emails. Based on that direction, following Garg's arrest on February 25, 2021, Hefton sent a larger number of emails. Hefton only stopped sending emails after March 8, 2021, when Garg was taken into federal custody and she understood that Garg would not be coming home and able to hurt her.

## E. Garg's Efforts to Frame Hutchins and Gonzalez

In addition to stalking Hutchins and other victims, Garg also worked hard to frame his primary victims, Hutchins and Gonzalez, for allegedly stalking Garg and Hefton. To do this, Garg created yet more anonymous email accounts and used those to send supposed stalking emails to himself and Hefton. Garg then caused Hefton to file false reports with the Seattle Police Department ("SPD") claiming that she and Garg were the victims of stalking and harassment by Hutchins and Gonzelez. And, Garg caused Hefton to file a lawsuit against Hutchins making similar false claims and seeking a protective order against Hutchins.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Over time, Garg took ever-more elaborate steps to make it appear that he was the victim, rather than the perpetrator of stalking. For example, on October 31, 2020, Garg had Hefton film him climbing over the fence into his own backyard. Garg then had Hefton call the police to report the supposed break-in. When Officer Timothy Oliverson arrived, Garg remained at his computer for several minutes scheduling supposed stalking emails to arrive over the coming half hour. Garg then told Officer Oliverson that Gonzalez had broken into his yard, showed Oliverson the film of (the masked) Garg climbing over his own fence, and pointed to the prescheduled emails that were by then arriving as supposed proof that he was the victim of stalking, since he supposedly could not be responsible for emails arriving in real time. *See* Tr. Exh. 072 (chart showing timeline); Tr. Exh. 143 (screenshots of emails).

Garg also took other steps to manufacture evidence framing Hutchins and Gonzalez. For example, Garg caused Hefton to report that she believed that Hutchins had followed her and had left a package of threatening emails in her mailbox on December 7, 2020 (when Hutchins was, unbeknownst to Garg, actually in New York). And, Garg altered the user agent string on his telephone to make it appear that the telephone was a Google Pixel 5XL, the type of telephone used by Gonzalez, before sending supposed stalking emails on the telephone.

Having worked to frame Hutchins and Gonzalez, Garg then sought to have them prosecuted and, presumably, imprisoned. As reflected in the victim impact statement filed by Michael Zigler, Garg made repeated calls to King County prosecuting authorities seeking to have criminal charges brought against Hutchins and Gonzalez.

The scale of Garg's stalking activity (both in number of emails – more than 3,000 – and number of victims), the violent and sexual nature of Garg's threats to victims and their families, Garg's refusal to stop even after Court action including his arrest, Garg's extension of the stalking to police officers and prosecutors investigating and prosecuting his case, Garg's use of physical force to compel another person to assist in the stalking, and Garg's far-reaching efforts to frame his victims and to have them arrested and

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

imprisoned are unlike any cyberstalking case ever seen in this District and, perhaps, anywhere.

### III.   PRESENTENCE REPORT

The Government has no objection to the facts, or to the Sentencing Guidelines calculation, contained in the Presentence Report.  Because Garg has objected to almost every element in the Presentence Report's calculation of his Sentencing Guidelines, the government will address that calculation and Garg's objections in detail.

### A.  Garg's Applicable Sentencing Guidelines

Garg was convicted of one count of conspiracy to commit cyberstalking, in violation of 18 U.S.C. § 371, and of six substantive counts of cyberstalking, in violation of 18 U.S.C. § 2261A.  Cyberstalking is governed by Section 2A6.2 of the Sentencing Guidelines.  *See* U.S.S.G. App. A.

The offense level for each count of cyberstalking is calculated separately.  *See* U.S.S.G § 2A6.2 comment. (n.4) ("[m]ultiple counts involving different victims are not to be grouped").  The conspiracy should be grouped with one of these counts.  *See id.* § 3D1.2(b) & comment (n.4).  Ultimately, it does not matter which, since it does not increase the offense level for that count.

#### 1.  Count 2 (Cyberstalking Melissa Hutchins)

*a.  Stalking and Domestic Violence*

The base offense level for cyberstalking is 18.  *See* U.S.S.G § 2A6.2(a).  Section 2A6.2(b) provides that

> (1) If the offense involved one of the following aggravating factors: (A) the violation of a court protection order; (B) bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; (D) possession, or threatened use, of a dangerous weapon; or (E) a pattern of activity involving stalking, threatening, harassing, or assaulting the same victim, increase by 2 levels. If the offense involved more than one of subdivisions (A), (B), (C), (D), or (E), increase by 4 levels.

U.S.S.G. § 2A6.2(b). The commentary defines a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim" to mean "any combination of two or mor separate instances of stalking, threatening, harassing, or assaulting the same victim, whether or not such conduct resulted in a conviction." *Id.* comment. (n.1).

Garg's offense involved "the violation of a court protection order," namely, the no- contact orders prohibiting Garg from having contact with Hutchins, *see* Trial Tr. Exhs. 901, 902. It also involved "a pattern of activity involving stalking, threatening, harassing or assaulting the same victim," namely the myriad threatening and harassing emails Garg sent to Hutchins (not to mention Garg's October 10, 2010, visit to Hutchins' apartment building). As a result, Garg's offense level is increased by 4 levels, to 22.

b. *Aggravating Role*

Section 3B1.1 provides that, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity . . . increase by 2 levels." U.S.S.G. § 3B1.1(c). Relevant factors in assessing a defendant's role include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.* comment. (n.4).

As the evidence at trial, including forensic evidence and Hefton's testimony, showed, all of these factors support the application of the adjustment in Garg's case. Garg was the person who made all of the decisions as to what acts of stalking to commit. Garg played the principal role in the stalking, sending all of the stalking messages other than the limited number sent by Hefton while Garg was in custody. Although the word "recruitment" seems ill-suited to the case, Garg coerced Hefton to assist him by threatening her with physical violence if she did not (both implicitly, based on their relationship, and expressly). Although the crime did not yield financial "fruits," the stalking fed Garg's desire for revenge, not Hefton's. Garg was the person who planned

and organized the stalking.  The scope of the stalking was immense, involving over 3,000 stalking emails.  And, Garg exercised near-absolute control, yielding only occasionally to Hefton's suggestion that he not pursue a particular act of stalking.  Because all of these factors show that Garg was an organizer, leader, manager, or supervisor of the stalking activity, Garg's offense level should be increased by 2 levels.

>             i.      Garg's Objections Lack Merit

Garg objects to the application of a leadership adjustment arguing that, at most, the government proved that Hefton did what she thought Garg wanted, and that his conduct could be categorized as facilitation, rather than the control or organization required by decisions such as *United States v. Holden*, 897 F.3d 1057, 1065 (9th Cir. 2018), and *United States v. Doe*, 778 F.3d 814, 824-26 (9th Cir. 2015).  Garg mischaracterizes the record.  Although Hefton did several initial emails of her own volition following Garg's November 1, 2020, she sent later emails after Garg told her to "[c]ontinue the messages."  Tr. Exhs. 529, 530.  And, more generally, Garg did not merely facilitate Hefton's conduct.  Hefton did almost everything that she did because Garg told her what to do and coerced her to do so through the use of physical violence and the threat of physical violence.  Garg cannot credibly dispute the fact that he both controlled and organized Hefton's conduct.

Garg also argues that the adjustment cannot be applied, based upon *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), because the jury did not find that he was a leader.  Garg ignores the fact that *United States v. Booker*, 543 U.S. 220 (2008), eliminated any requirement that a jury find sentencing factors under the federal Sentencing Guidelines by making the Sentencing Guidelines advisory.  As a result, Garg's argument lacks merit.

Garg next claims that the adjustment cannot be applied because the facts relied upon supposedly already "were encompassed in the convicted conduct," so that application of the adjustment would constitute improper double counting.  Garg's argument is nonsensical.  The calculation of Garg's offense level under Section 2A6.2

neither required, nor reflected, Garg's leadership.  The fact that Garg is responsible under Section 2A6.2 for conduct of his co-conspirator (as she would be for his) does not mean that it is double counting to apply 2 levels under Section 3B1.1 for leadership, and Garg has not provided any authority to suggest that it does.

Finally, Garg claims that the adjustment cannot be applied because it supposedly is based on the testimony of his wife, whom Garg assails as being not credible.  Garg ignores the fact that Hefton's testimony was consistent with all of the other evidence in the case.  Garg also ignores the fact that evidence of Garg's leadership and control is not limited to Hefton's testimony, but also was corroborated by jail recordings and the Ring video clips that the government introduced, which not only showed Garg directing Hefton's conduct, but also showed Garg belittling Hefton as he did so, and made clear Garg's control of Hefton.  *See* Tr. Exh. 529, 530 (in which Gag calls Hefton "stupid" as he directs her to "[c]ontinue the messages"); Tr. Exh. 863 (in which Garg calls Hefton "dumbass," because he is dissatisfied with her effort to film his climb into his own yard).

Thus, Garg's objections are without merit, and the Court should apply the adjustment for leadership.

### c.  *Obstruction of Justice*

Section 3C1.1 provides that

> [i]If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1.  "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

prosecution of the offense of conviction." *Id.* comment. (n.1).  Examples of conduct that is obstruction include

> (C)      producing or attempting to produce a false, altered or counterfeit document or record during an official investigation or judicial proceeding;
>
> . . .
>
> (D)      destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (*e.g.,* shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; [and]
>
> . . .
>
> (G)      providing materially false information to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense
>
> . . . .

*Id.* comment. (n.4).  Evidence is material that "if believed, would tend to influence or affect the issue under determination." *Id.* comment (n.6).  To support the application of this adjustment, at least in some contexts, a district court should make specific findings as to what conduct supports the adjustment. *See United States v. Herrera-Rivera*, 832 F.3d 1166, 1174 (9th Cir. 2016) (noting that district courts must make express findings as to each element of obstruction of justice where the obstruction involves false testimony).

The Court should make the required finding with respect to multiple acts by Garg. First, Garg sent hundreds of fake stalking emails to himself and Hefton – that is, counterfeit documents – during law enforcement's investigation to thwart law enforcement's investigation of his stalking (and encourage an investigation of Hutchins and Gonzalez).  Second, Garg directed Hefton to destroy the clothes that he had worn to the lobby of Hefton's building on October 10, 2020. *See* Tr. Exhs. 527, 528 (recording of telephone call from King County Jail in which he instructed Hefton to "[t]hrow away the clothes . . . which I often wear").  And, when Hefton failed to do that, Garg subsequently

hid the clothes behind the shed in his yard to conceal them from possible law enforcement search.

Third, while jailed in November 2020, Garg instructed Hefton to continue sending stalking emails to divert attention away from himself. *See* Tr. Exhs. 529, 530 (recording of telephone call in which he instructed Hefton to "[c]ontinue the messages"). Fourth, on October 31, 2010, Garg created video of himself climbing into his own yard, scheduled supposed "stalking" emails addressed to him and to Hefton, and then reported to Officer Oliverson that Gonzalez was the person shown climbing into his yard and that Hutchins and Gonzalez were sending the stalking emails.

Garg engaged in, or continued, each of these forms of obstructive conduct after he had been arrested and jailed in King County Jail in November 2020. As a result, he was certainly aware of an investigation and prosecution of his conduct. And, each form of obstructive conduct was "material." As the Court is aware from the evidence at trial, Garg created a factual morass in which law enforcement, understandably, struggled to figure out whether Garg was a perpetrator or a victim. Each form of conduct, "if believed" would "tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 comment (n.6). Garg (who continued to argue the supposedly exculpatory import of all of his obstructive conduct at trial) certainly believed this was the case. Because Garg engaged in multiple forms of obstructive conduct, the Court should increase Garg's offense by 2 levels for his obstruction of justice.

i.     Garg's Objections Lack Merit

As with the leadership adjustment, Garg objects to the obstruction-of-justice enhancement as reflecting conduct that already is accounted for. Garg appears to make this same argument in several ways, but all essentially involve cases that hold that it is improper to "double count" by using the same conduct to support multiple Guidelines factors or adjustments. *See, e.g., United States v. Lamere*, 980 F.2d 506, 517 (8th Cir. 1992) (reversing obstruction-of-justice enhancement in a case charging concealment of counterfeit currency, since the enhancement "was based upon conduct that was

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

coterminous with the conduct for which he was convicted"). But, the Presentence Report does no such thing. The obstruction-of-justice enhancement here is based upon Garg's creation of counterfeit stalking emails addressed to himself, his direction to Hefton to send stalking emails when he was in custody to divert attention from him, his attempted destruction of evidence, and his false reporting to law enforcement. None of these were factors that were required for Garg's convictions of cyberstalking (which was based upon Garg's actual stalking of victims) or for the calculation of Garg's offense level under Section 2A6.2. As a result, there is no impermissible double count.

Garg also argues that the adjustment does not apply because the government was not prejudiced at trial. But, that is not the test. If it were, the adjustment never would apply where the government figured out an obstruction before trial. Rather, as the Guidelines commentary clearly provides, the test is materiality – whether the evidence "if believed, would tend to influence or affect the issue under determination." U.S.S.G. §3C1.1. comment (n.6). And, here, the evidence met the test – the evidence if credited certainly would influence the determination of whether Garg was the stalker (and did, by muddying and impeding State law enforcement investigation).

> d. *Offense Level for Count 2*

Factoring in all of the applicable adjustments, and rejecting Garg's objections, the Court should find that Garg's offense level for Count 2 is 26.

## 2. **Count 3 (Cyberstalking Michael Zigler)**

The Sentencing Guidelines calculation for this Count is exactly the same as for Count 2 (although only one protective order protected Michael Zigler, *see* Tr. Exh. 901). As a result, the Court should find that Garg's offense level for Count 3 is also 26.

## 3. **Count 4 (Cyberstalking Cesar Gonzalez)**

The Sentencing Guidelines calculation for this Count is exactly the exactly the same as for Count 3. As a result, the Court should find that Garg's offense level for Count 4 is also 26.

4. **Count 5 (Cyberstalking Mark Blair)**

The offense level under Section 2A6.2 for this offense is 24, because the crime did not involve violation of a protective order (so that only 2 points, rather than 4, are added under Section 2A6.2(b)).  Otherwise, the Sentencing Guidelines calculation for this Count is exactly the same as for Count 2.  As a result, the Court should find that Garg's offense level for Count 5 is 24.

5. **Count 7 (Cyberstalking Kailey Kang)**

The offense level under Section 2A6.2 for this offense is 24, because the crime did not involve violation of a protective order (so that only 2 points, rather than 4, are added under Section 2A6.2(b).  As with earlier counts, the offense level for this account is increased based both on Garg's leadership, and Garg's obstruction of justice.  The offense level for the Count is also subject to an adjustment not applicable to earlier counts.

*a.  Official Victim*

Section 3A1.2 provides that "[i]f (1) the victim was (A) a government officer or employee . . . and (2) the offense of conviction was motivated by such status, increase by 3 levels."  U.S.S.G. § 3A1.2(a).  It also provides that "[i]f subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person), increase by 6 levels."  *Id.* § 3A1.2(b).

Detective Kang is a government officer or employee.  Garg's stalking was motivated by that status:  Garg did not know Detective Kang except through her involvement in investigating his conduct; and Garg even sent emails that taunted Detective Kang, claiming that she could not catch him.  Finally, the applicable Chapter Two guideline, Section 2A6.2, is from Chapter Two, Part A.  As a result, Garg's offense level should be increased by 6 levels.

i.  Garg's Objections Lack Merit

Garg objects to this adjustment on multiple grounds.  First, Garg asserts (without authority) that the adjustment only applies to federal government officials.  Nothing in

the language of the guideline or commentary suggests that this is the case. And, indeed, the Ninth Circuit has squarely rejected Garg's argument. *See United States v. Alexander*, 287 F.3d 811, 820 (9th Cir. 2002) (holding that "the plain meaning of the words used in § 3A1.2(a) requires a district court to apply it to state officials or employees who are the victims of a federal crime").

Second, Garg suggests, but does not show, that other defendants who threatened law enforcement may not have received the adjustment, and asserts, without authority, that arbitrary application of the enhancement to him would be unfair and would violate his Fifth and Eighth Amendment rights. Garg's claim is undermined by his failure to show that any other defendant who should have received the adjustment did not in fact receive the adjustment. Even if an error occurred in some other case, that would not establish that Garg was entitled to have his Sentencing Guidelines adjusted downward in the same way.

Third, Garg argues that the government previously argued (at trial) that Garg stalked people who "supported" Hutchins, and that the government should not now be permitted to argue that Garg stalked Detective Kang because of her official status. Garg is over-parsing the government's argument. Detective Kang supported Hutchins, not as a pre-existing friend, but as the investigating officer who ultimately apprehended Garg and ended his stalking of Hutchins. As a result, there is nothing inconsistent in the government's statements at trial and its current argument that the official-victim enhancement applies.

Fourth, Garg argues that Garg's mere knowledge of Detective Kang's status is insufficient to support the enhancement. Garg relies upon *United States v. Sulik*, 929 F.3d 335 (6th Cir. 2019), which held that a defendant's mere knowledge that a victim was a government official was insufficient to support the enhancement where the victim's motive was personal (e.g., a senator's husband who killed the senator because she filed for divorce, not because she was a senator). But, Garg had no personal motive to threaten Detective Kang. He stalked her only because she was the officer investigating, and who

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

arrested, him.  In other words, Garg did not merely know that Detective Kang was an official.  Rather, his "offense . . . was motivated by such status."  U.S.S.G. § 3A1.2(a).

### b. *Offense Level for Count 8*

Factoring in all of the applicable adjustments, and rejecting Garg's objections, the Court should find that Garg's offense level for Count 7 is 30.

### 6.  **Count 8 (Cyberstalking Gary Ernsdorff)**

The Sentencing Guidelines calculation for this count is exactly the same as for Count 7.  Like Detective Kang, Garg stalked Gary Ernsdorff, with whom he had no prior relationship, because of his official status, including expressly and repeatedly taunting him about his failure to solve the case.  As a result, the Court should find that Garg's offense level for Count 8 is 30.

### 7.  **Garg's Combined Offense Level**

As reflected in the Presentence Report, Garg has a total of 5.5 "units."  *See* Presentence Report ¶ 82; U.S.S.G. § 3D1.4.  As a result, Garg's offense level for his highest Count, that is 30, is increased by five levels, resulting in a total offense level of 35. *See* Presentence Report ¶¶ 83-85; U.S.S.G. § 3D1.4,

### i.  Garg's Objections Lack Merit

Garg again objects on multiple grounds.  First, Garg suggests, but does not show, that other defendants who threatened multiple victims may not have received a combined-offense adjustment and asserts, without authority, that arbitrary application of the adjustment to him would be unfair and would violate his Fifth and Eighth Amendment rights.  Garg's claim is undermined by his failure to show that any other defendant who should have received the adjustment did not actually receive the adjustment.  Even if an error occurred in some other case, that would not establish that Garg was entitled to have his Sentencing Guidelines adjusted downward in the same way.

Second, Garg notes that an email sent by undersigned counsel in February 2023, suggested that Garg would only have three-and-a-half units.  As the government previously has told the Court, some of the government's earlier attempts to calculate

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Garg's sentencing exposure, including apparently the February 2023 email, were incorrect.  Garg also claims that Count 8 should be dismissed.  Neither the government's prior error (now corrected), nor Garg's recurrent claim that Count 8 should be dismissed, are reasons for the Court to decline to apply the adjustment.

Third, Garg claims that, because the Presentence Report already includes impacts reported by multiple victims, the combined-offense adjustment constitutes an impermissible double count.  Predictably, Garg does not support his argument with applicable authority.  Rather, he cites only a decision, *United States v. Levy*, that is not to be found at the citation provided, and that he cites only for the general definition of "impermissible double counting."  And, the mere fact victims have reported the impact of Garg's crime, and that that is reflected in the PSR, does not mean that incorporating the combined-offense adjustment constitutes double counting.  Rather, it is exactly what the Sentencing Guidelines require by providing that counts involving stalking different victims each constitute a separate group.  *See* U.S.S.G § 2A6.2 comment. (n.4)

Fourth, Garg makes a series of other objections (such as his claim that the jury was not given a true-threat instruction and his claim that cyberstalking does not qualify as a crime of violence), which do not seem to actually to be relevant to Garg's challenge to the combined-offense adjustment.

### 8.  Garg's Other Guidelines Objections

Garg makes two other objections to the Presentence Report's calculation of his Sentencing Guidelines:

First, he claims that he should receive a downward adjustment for a minor role, under Section 3B1.1.  As previously noted, Garg was the organizer and leader of the stalking, and his wife, Hefton, was the minor participant, coerced by Garg's violence.  As a result, Garg certainly is not entitled to a minor-role adjustment.

Second, Garg claims that he should receive a 2-level downward adjustment under Section 4C1.1, as a zero-point offender.  That section only applies if a defendant meets 10 listed criteria.  *See* U.S.S.G. § 4C1.1(a).  Those include two that Garg cannot meet.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

First, a defendant must "not use violence or credible threats of violence in connection with the offence." *See id.* § 4C1.1(a)(3). Garg cannot qualify because he made myriad threats to rape, torture, and kill victims and their family members. Second, a defendant must "not receive an adjustment under § 3B1.1 (Aggravating Role)." *See id.* § 4C1.1(a)(10). As previously discussed, Garg should receive an adjustment for leadership.

For these reasons, Garg is not eligible for the downward adjustments he seeks.

### 9. Garg's Combined Offense Level

Based upon a Total Offense Level of 35 and a Criminal History Category of I, Garg has an advisory sentencing range of 168-210 months.

## IV. SENTENCING RECOMMENDATION

The Government recommends that the Court sentence Garg to 180 months' (that is, 15 years') imprisonment. This sentence appropriately balances the factors set forth in 18 U.S.C. §3553(a).

**1.     "The nature and circumstances of the offense."** Garg has committed an extremely serious offense. For more than a year, he engaged in an ever-expanding cyberstalking campaign. He harassed six named victims, and many more of their family, friends, and acquaintances in a variety of ways. These included things as simple as making hang-up telephone calls. They extended to impersonating the victims on social media, impersonating victims' acquaintances and maligning victims to others, and making complaints about victims to professional organizations and/or on their businesses' websites. These actions alone traumatized victims, who felt they had lost control of their lives and had no way to defend themselves.

Garg moved from there to making graphic and vile threats to harm victims. These included explicit threats to sexually assault victims, and their family members, in grotesque manners. They included threats to torture victims. And, they included threats to kill victims. And the threats were relentless. Garg ultimately sent more than 3,000 stalking emails over the course of the scheme.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Garg ignored, or ran through, all efforts to restrain him. Although he was arrested and jailed from November 1-13, 2020, and protective orders were entered protecting three of his victims, Garg returned to stalking within hours of his release. And, Garg was not content to limit his conduct to his former victims. Instead, Garg expanded his stalking to include Detective Kang (the police officer primarily responsible for his arrest) and Gary Ernsdorff (the prosecuting attorney handling his case).

Garg's conduct was also aggravated by the fact that, unlike many, perhaps most, stalkers, his conduct crossed the line from pure threat to physical violence. Although Garg did not actually assault any of his victims, he coerced his wife, a longtime victim of domestic violence at his hands, to assist in the stalking through threats of additional violence. Garg also framed his victims, sending himself and Hefton supposed stalking emails from anonymous accounts, and causing Hefton to file repeated police reports and to file a lawsuit claiming that Hutchins and Gonzalez were stalking them. Garg also sought to have Hutchins and Gonzalez prosecuted, and perhaps even jailed, on these false charges.

Garg's conduct terrorized, and continues to terrorize, his victims. As the Court will recall, Hutchins was unable to look at Garg even as she testified, more than three years after the stalking ended. Victims were afraid to leave their apartments, unable to live their lives without fear, unable to concentrate on work or to sleep worrying about what Garg might do. Hutchins and Gonzalez fled to New York for more than a month to try to escape Garg's stalking. Another victim, Detective Kang, sold her house and moved in an effort to escape Garg's stalking. To date, four victims have submitted victim impact statements that spell out the toll that Garg's stalking took upon them, and the effect that it continues to have on their lives. And, to date, two victims, Melissa Hutchins and Gary Ernsdorff have asked to address the Court at sentencing to explain the impact of Garg's crime upon them.

**2. "The history and characteristics of the defendant."** Although Garg has no prior criminal history, his history over the course of this case and his characteristics

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

are deeply troubling. While Garg appears to have delighted in his victims' suffering, he Garg appears to be utterly incapable of empathizing with others. With an apparently insatiable desire to even the score, Garg took a simple rent dispute between roommates, and escalated it into a massive cyberstalking campaign against an ever-growing number of victims, making grotesque and violent threats that are almost impossible to fathom.

Unlike most defendants, even following his arrest, Garg has refused to accept any responsibility for his conduct, blaming his situation on prior counsel for their supposed poor representation, prosecutors for their supposed misconduct, and the Court itself for its supposed bias. Garg pursued, through trial, a defense based on fraudulent evidence that he manufactured during the course of his stalking campaign in his efforts to frame Hutchins and Gonzalez, even though that evidence has been thoroughly debunked. And, Garg suggested at trial both that his victims (Hutchins and Gonzalez) and that the wife whom he claimed to love but in fact abused (Hefton) were the persons responsible, or principally responsible, for the stalking.

Even now, Garg continues to deny all responsibility. Indeed, he notes in his objections to the Presentence Report that the "steadfastly maintains his innocence," and seeks to litigate, and relitigate, the most tangential facts, such as the nature of his roommate relationship with Hutchins long before their falling out and the start of Garg's stalking campaign. This, despite the fact that he continues to seek to enforce a long-expired plea offer which, of course, necessarily implies his guilt.

**3.      The need for the sentence to "reflect the seriousness of the offense," "to provide just punishment," "to afford adequate deterrence," and "to protect the public."** A lengthy sentence is needed to reflect the seriousness of the offense, and to provide just punishment. A lengthy sentence also is needed to deter others in this age of growing online criminal conduct. Most important, a lengthy sentence is needed to protect the public, and in particular the victims of Garg's stalking. Garg's lack of acceptance of responsibility, his demonstrated lack of empathy, and his pattern to date of constantly escalating a minor situation regardless of the consequence to others in an apparent never-

ending effort to even the score, all suggest a serious danger that Garg will return to stalking the same victims as soon as he is released from prison.

Garg's first state arrest, and the resulting protective orders were utterly ineffective to stop Garg.  Garg scoffed at them, emailing Hutchins "{d]id you really thing a few days in jail was going to scare me?" *See* Tr. Exh. 178.  And, he continued his stalking with renewed intensity.  Only federal incarceration, and the consequent limitation on Garg's computer access, has proved sufficient to stop Garg.  When Garg ultimately is released, it is likely, but not certain, that he will be deported to India (Garg has not waived deportation and no doubt will fight it as vigorously as he now is fighting to evade criminal responsibility).  In India, he would be unsupervised, and there is every reason for Garg's current victims, and others, to believe that Garg would return to stalking.  The Court should impose a lengthy sentence to ensue that day is far in the future.

**4.      The kinds of sentences available**.   A sentence of imprisonment is appropriate in Garg's case (and is required by the three counts with a one-year mandatory minimum.

**5.      The sentencing range.**  Garg's sentencing range is 168-210 months.  The 180-month (that is, 15-year sentence that the government is recommending falls within this range.

**6.      The need to avoid unwarranted sentence disparities among defendants.**

Although Garg does not have any co-defendants in this case, the sentence that the government is seeking would treat Garg comparably to other defendants who have engaged in egregious and aggravated stalking.

Garg's case is unparalleled in this District.  The longest cyberstalking sentence of which the government is aware in this District is the 72-month sentence that Judge Robart recently imposed in *United States v. Crawford*, No. CR22-087 JLR (W.D. Wash.).  But, Crawford's conduct was far less egregious than Garg's   Like Garg, Crawford's stalking was focused on a single victim, but included to include numerous of her acquaintances, and like Garg, Crawford violated multiple protective orders.  But, unlike Garg, Crawford

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

did not ignore arrest and jailing, did not expand his stalking to law enforcement and prosecutors, did not use force to coerce an accomplice to assist him, and did not frame and attempt to imprison his victims. As a result, Garg deserved a sentence far longer than Crawford.

Garg's conduct is more akin to several stalkers who have engaged in extensive cyberstalking in other districts. These include

- Gueorgui Pantchev, who was sentenced to 216 months' (that is, 18 years') imprisonment after he stalked and harassed four female VA doctors, including by sending them large number of harassing and intimidating messages threatening them with violence and distributing lewd flyers bearing their pictures and addresses, and who continued his stalking after serving a prison sentence for stalking two of them. *See United States v. Gueorgui Pantchev*, No. 2:21-CR-50-JFW (C.D. Ca.).

- Michael Hagar, who was sentenced to 180 months' (that is, 15 years') imprisonment after he sent threatening emails to employees at a former employer, as well as local law enforcement and prosecutors, and who violated protection orders by continuing to do so. *See United States v. Michael Hagar*, No. 1:16-CR-00273-DCN(1) (N.D. Oh.).

- Marshal Marshall, who pled guilty to two counts of cyberstalking and was sentenced to the maximum 120 months' (that is 10 years') imprisonment for sending threatening messages to a former romantic partner, who violated protection orders in continuing to do so, and who apparently had planted recording devices in the victim's house and car. *See United States v. Marshal Marshall,* No. 2:18CR3013-001.

Notably, none of Pantchev's, Hagar's, and Marshall's conduct included all of the aggravating factors present in Garg's case, namely (1) the volume of stalking messages, (2) the violent nature of the threats, (3) the number of victims, (4) the continued stalking even following a defendant's arrest and (temporary) jailing and the entry of protective

orders protecting victims, (5) the escalation to also stalking investigating police officers and prosecutors, (6) the use of actual physical violence to coerce a co-conspirator (Garg's wife) to assist in the scheme, and (7) the extensive effort to frame victims as the supposed stalkers and to have victims themselves arrested and prosecuted.  Avoiding disparity requires Garg to should receive a sentence comparable to, or longer than, those imposed on these defendants.

**7.    The need to provide restitution to victims.**  Only one victim, Hutchins, is seeking restitution.  As Hutchins' victim impact statement indicates, Hutchins is asking the Court to impose a lengthy sentence.  As a result, a lengthy sentence will not undercut the wish of any victim for a shorter sentence to facilitate Garg paying restitution.

. . .

Based on all of these factors, the government believes that a sentence of 180 months appropriately balances the considerations set forth in 18 U.S.C. § 3553.  It appropriately punishes Garg for his crimes, it protects Garg's victims and the public by incapacitating Garg for a significant period of time, and it deters others who might commit similar crimes.  A lesser sentence would fail to achieve these objectives.

## V.  RESTITUTION

Although the Ninth Circuit has not yet addressed, the issue, numerous courts have found that cyberstalking is a crime of violence. *See, e.g., United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D.N.Y. 2018). *United States v. Hollingberry*, No. 2003058MJ001PHXMTM, 2020 WL 2771773, at *3 (D. Ariz. May 28, 2020), aff'd, No. 20-10183, 2020 WL 5237342 (9th Cir July 23, 2020); *United States v. Kukstis*, No. 4:18-mj-04174-DHH (D. Mass. May 04, 2018) (Memorandum and Order on Detention); *United States v. Harrison*, 354 F. Supp. 3d 270, 278 (W.D.N.Y. 2018); *United States v. Grooms*, 3:15-mj-00025, 2015 WL 1982097, at *5 (S.D. W. Va. Apr. 29, 2015); United *States v. Shrader*, No. 1:09-cr00270, 2010 WL 503092, at *3 (S.D. W. Va. Feb. 8, 2010); *United States v. Neuzil*, No. 09-CR-2020-LRR, 2009 WL 2030373 (N.D. Iowa July 13, 2009).  As a result, the Court is required to order that Garg pay restitution to victims who

have "suffered a . . . pecuniary loss." *See* 18 U.S.C. § 3663A(a)(1), (c)(1).  (Even if cyberstalking were not a crime of violence, the Court would be permitted, and should, order restitution to victims pursuant to 18 U.S.C. § 3663(a)(1)(A)).

Only one victim, Melissa Hutchins is seeking restitution.  Hutchins has provided a declaration and supporting documentation, attached as Exhibit A, that details $28,079.23 of losses and costs that she (and in some cases Gonzalez) incurred as a result of Garg's crimes.  The vast majority of this amount are legal fees, and costs for electronic discovery that she incurred to defend herself against a fraudulent lawsuit filed against hy Hefton, in furtherance of the stalking scheme, and in Hutchins' own action seeking a protective oreder against Garg to try to stop his stalking.  These legal costs, and the other costs laid out in Hutchins' affidavit, are the direct results of Garg's criminal conduct and are properly considered losses under restitution statutes.  *See, e.g., United States v. DeGeorge,* 380 F.3d 1208 (9 th Cir. 2004) (approving award of restation fees for legal fees incurred by an insurance company in defending against a defendant's fraudulent insurance claim).

Hutchins would not have incurred any of the costs listed in her declaration, but for Garg's crimes, of which she was the principal victim.   As a result, the Court should find that these are pecuniary losses that result from Garg's crimes, and should order Garg to pay restitution to Garg in the amount of $28,079.23.

## VI.  CONCLUSION

For the foregoing reasons, the Court should sentence Garg to a total of 180 months' imprisonment, to be followed by a three-year term of supervision.  (The government suggests that the Court sentence Garg to 60 months on Count 1, 60 months, consecutive on Count 2, and 60 months on Counts 3, 4, 5,7, and 8, all concurrent to each other but consecutive to Counts 1 and 2.)  The Court should waive a fine, based upon

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

Garg's inability to pay, but should impose the mandatory $700 penalty assessment. The Court also should order Garg to pay $$28,079.23 in restitution to Hutchins.

DATED: this 2nd day of July, 2024.

Respectfully submitted,

TESSA GORMAN
United States Attorney

*/s/ Andrew C. Friedman*
_____
ANDREW C. FRIEDMAN
Assistant United States Attorney

*/s/ Anthony Teelucksingh*
_____
ANTHONY TEELUCKSINGH
Senior Trial Attorney
Computer Crime and Intellectual
    Property Section
United States Department of Justice

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  I also mailed by United States Postal Service first class mail, the foregoing to the following non-CM/ECF participant:

Sumit Garg, Register No. 33491-509
FDC SeaTac
Federal Detention Center
P.O. Box 13900
Seattle, Washington  98198

/s/ Andrew C. Friedman
ANDREW C. FRIEDMAN
Assistant United States Attorney

700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:    (206) 553-7970
Fax:              (206) 553-0882

GOVERNMENT'S SENTENCING MEMORANDUM/GARG (No. CR21-0045 JCC) - 30

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970