The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 21-0045-JCC |
| Plaintiff, | ) | |
| v. | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| SUMIT GARG, | ) | |
| Defendant. | ) | |
| | ) | |

Sumit Garg, by and through his attorney Nicholas J. Vitek and Vitek Law LLC, hereby files this memorandum in aid of sentencing.[1]

Mr. Garg was convicted of cyberstalking multiple individuals, including his former roommate, her boyfriend, her uncle and attorney, one of the investigating officers, and the state prosecutor. Over the span of approximately a year, Mr. Garg sent hundreds of threatening emails to these victims. These emails ranged from the innocuous to the vile, including threats of rape and death. There is no doubt that this is serious conduct that warrants a serious sentence.

However, the sentence sought by the United States and Probation is not a fair one; it is based on the flawed presumption that a guideline sentence is reasonable. The

---

[1] Mr. Garg is *pro se*. Mr. Garg requested that undersigned counsel draft a sentencing memorandum on his behalf. The arguments made herein are those of counsel and are separate from those raised by Mr. Garg in his objections to the PSI. The arguments are based on the factual record available to all parties.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 1

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

Supreme Court has made it clear that our law does "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *See e.g.*, *Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892, 172 L. Ed. 2d 719, 2009. Instead, this Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, deter others from committing similar crimes, and protect the public from further harm caused by the defendant. 18 U.S.C. § 3553(a). There is no evidence to support the argument that a guideline sentence meets the statutory requirements for sentencing Mr. Garg, apart from the general notion that more prison time is better. Importantly, the sentence sought by Probation and the Government is a sentence that is **9 times** the median sentence of that of a defendant like Mr. Garg—a first-time offender for stalking—and **3 times** the average sentence for similarly situated defendants. *See infra*. In short, to imprison Mr. Garg as requested by Probation and the United States would result in an unjust sentence.

Mr. Garg seeks a sentence of 48 months. Such a sentence is a sentence that is sufficient but not greater than necessary. It is a sentence that is significantly longer than similarly situated defendants who have been convicted for similar offenses, but it seeks to punish Mr. Garg progressively as opposed to exponentially. Such a sentence is a sentence that is sufficient but not greater than necessary because it recognizes Mr. Garg's serious mental health challenges and their role in the offense. It is a sentence that reflects the sentences for similarly situated defendants, recognizes that Mr. Garg is a first-time offender who lacks any indicia of reoffending, and reflects the serious collateral consequences that Mr. Garg will face by his conviction, including the loss of working in

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 2

the tech sector and his likely deportation to India. It is a sentence that reflects the seriousness of the misconduct –years in jail – but balances that sentence with the "unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." In short, it is not only a sufficient but not greater sentence, it is the only sentence that is both fair and just.

## I.    A 48-Month Sentence Is A Sentence That Reflects The Seriousness Of the Offense.

The dichotomy of sentencing choices may come down to whether you view Mr. Garg as an inveterate criminal who will stop at nothing to continue his crimes thereby requiring a sentence of more than a decade to incapacitate him from future misconduct, or whether you view Mr. Garg as a flawed individual with serious mental health challenges who, when faced with the apparent destruction of all he had spent his life building – a family, a home, a good job and a chance of making a success out of life – engaged in a campaign of harassment and stalking to strike at the people he perceived were the cause of that destruction. The evidence points to the latter rather than the former.

### a.    Mr. Garg's Struggles In Early Life and His Diagnosis with PTSD and OCD Left Him Unprepared For The Trauma Of His Wife's Cancer, Loss Of Job And Potential Deportation From The United States.

Mr. Garg started life in abject poverty in India, in a home with a dirt floor, clay walls with no running water or electricity. PSI ¶ 99. Against all odds, Mr. Garg was able to go to school, become educated and enter university. *Id.* ¶ 129. This period was not easy; Mr. Garg has an ACES score of 8 by probation and a score of 9 by Dr. Joanne

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 3

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

Solchany, an expert retained by undersigned counsel who specializes in psychiatric and mental health evaluations. *See* Ex. A. Dr. Solchany notes that "childhood trauma not only impacts mental health and social life, but physical health. A score of 4 indicates a high risk of physical issues such as hearth disease and stroke due to the child's hormones rising to a level so high it results in vascular damage and compromise the immune system; Mr. Garg's score is about 2 1/2 times that." Ex. A at 4. Based on these childhood struggles, Dr. Solchany diagnosed Mr. Garg with PTSD, Severe, Chronic.

In addition to PSTD, Dr. Solchany finds that Mr. Garg suffers from Obsessive Compulsive Disorder, Severe, Chronic, and an Anxiety Disorder. His symptoms of OCD "drive him to seek control of things around him, they drive him to prove specific things that are or become important to him, and to act in certain ways." *Id.* at 11." One of the symptoms for OCD is "repetitive behaviors…or mental acts…that the individual feels driven to perform in response to an obsession or according to rules that must be applied rigidly." Ex. A pg. 10. Mr. Garg notes that this manifests itself with his attorneys. "I will bother him so much…I send him something and I worry he will not do it well… I bug him 10 times to make sure he will do it right and be done in a specific manner." *Id.* at 7.

The cause of OCD is uncertain, but a current theory is that OCD symptoms "arise from structural and functional abnormalities in the orbitofrontal-subcortical circuits which are thought to connect regions of the brain involved in processing information with those involved in the initiation of certain behavioral responses." Ian Freckleton, *Obsessive compulsive disorder and obsessive compulsive personality disorder and the criminal law*, Psychiatr Psychol Law. 2020; 27(5): 831–852 (available at

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 4

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8009125/). In short, it is not a defect of character but a serious mental health ailment that requires intervention and treatment. OCD is a common ailment that can be treated with medication and behavioral therapy. See Ex. A, pg. 12 Recommendations.

Overcoming a childhood marked by trauma and adversity is a significant accomplishment that should not be underestimated. This Court frequently encounters individuals with post-traumatic stress disorder (PTSD) and high Adverse Childhood Experiences (ACEs) scores who have struggled to achieve even a fraction of what Mr. Garg has accomplished. Mr. Garg's ability to overcome his difficult start in life and achieve success is particularly noteworthy. By 2015, Mr. Garg's life appeared to be on a good trajectory. He had moved from India to the United States to study – a feat that is the dream of many Indians but one that only a few are able to achieve. PSI ¶ 106. While at Texas A&M Business School he was able to excel academically, and his job prospects were high. In addition to his academic and work life coming together, Mr. Garg met Lindsay Hefton who was also a student at Texas A&M. ¶ 107. Ms. Hefton appears to have had a similarly turbulent childhood and the two bonded, eventually marrying in 2016. Mr. Garg describes his relationship with Ms. Hefton as his first major relationship. Ex. A pg. 3. Likewise, it appears that Mr. Garg was Ms. Hefton's first serious relationship. USA_00016177.

It is true that Mr. Garg did not want to reveal that the two were married, but this was not because of any shame on Mr. Garg's part. Rather, Mr. Garg's family is from India, where the eldest son, particularly one who has achieved the success of Mr. Garg –

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 5

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

studying and working in the United States – is acutely valuable to a family where important family relationships could be created or cemented through arranged marriages. The concept of "love" relationships certainly exists but was not widely accepted by Mr. Garg's family, in which duty to family was a value that Mr. Garg was expected to uphold. Likewise, based on Ms. Hefton's religious upbringing, it is likely that she had her own motivations to keep the marriage secret from her family. Regardless of the publicity of their marriage, there is little doubt that Mr. Garg was very much in love with Ms. Hefton – she was, as he describes, ""the best thing that ever happened to me." Ex. A at 3.

Thus, at the close of 2018, everything appeared to be working for Mr. Garg. He had left India, had graduated from a well-regarded university in the United States, was employed by an arm of IBM, and had married a woman with whom he was deeply in love. However, Mr. Garg was unprepared for a series of shocks to his world.

### b. Ms. Hefton Develops Cancer Requiring Mr. Garg To Leave The Security Of His Job And The Immigration Status It Provided.

In late 2018, Ms. Hefton completed her schooling and accepted a job with Amazon. In October 2018 she and Victim 1 became roommates. Mr. Garg was still in Texas because his immigration status[2] was based on his employer who was based in Texas. PSI ¶ 107. The plan between Mr. Garg and Ms. Hefton was that Ms. Hefton would move to Seattle and that Mr. Garg would follow soon after once he had secured employment that would permit his immigration status to follow him to Seattle. *Id.*

---

[2] It is unclear why Mr. Garg did not adjust his immigration status based on his marriage to a US Citizen. It could be because of the associated cost, or it could be because to adjust his status would likely result in revealing the marriage to their families.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 6

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

However, in December 2018 and for the months after, Ms. Hefton developed a series of unexplained illnesses. *Id.* Although Ms. Hefton would eventually be diagnosed in 2019 with Hodgkin's Lymphoma, all Mr. Garg saw was that his wife was sick and becoming sicker by the day.

Mr. Garg quit his job and moved to Seattle to help support his wife. *Id.* This meant that Mr. Garg had no income and his status in the country was tenuous. *Id.* Early on, the types of disputes that appear from the records are those typical among roommates – arguments about dividing up chores, beliefs that one is overpaying for one aspect or another for the apartment – but nothing beyond the typical roommate disputes that happen myriad times a day all over the world. *See e.g.*, Def Ex. 1-3 As Mr. Garg made much of during the trial, the three of them would even travel together and had made plans at one point to take another trip together.[3] However, Ms. Hefton's health continued to decline, and Mr. Garg became more distraught.

Ms. Hefton's declining health triggered Mr. Garg's PTSD and his OCD compulsions to become more apparent. This is because, as Dr. Solchany writes, an aspect of OCD is a desire to create control over uncontrollable situations. Ex. A pg. 10 (OCD "behaviors or mental acts are aimed at preventing or reducing anxiety or distress, or preventing some dreaded event or situation.") Thus, what began as normal roommate disputes became elevated, heightened and amplified as Mr. Garg desperately tried to create order from the situation he was seeing – his wife dying.

---

[3] Although not discussed in the record, Mr. Garg's serious OCD is likely to make him a difficult roommate since a symptom of OCD is rigid and repeated behavior.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 7

**VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800**

For Mr. Garg, this period is a seminal moment as the reality of the fragility of his life comes into focus. The death of Ms. Hefton is unimaginable to Mr. Garg and everything that appeared to be going well was threatened to disappear and be destroyed. In addition to Ms. Hefton's cancer, and Mr. Garg's PTSD and OCD, Mr. Garg and Ms. Hefton were also not working. USA_0016180. At this point in May 2019, Ms. Hefton was undergoing treatment for cancer which caused her to become even weaker and sicker. Money worries quickly piled up, and the routine disputes between roommates became to Mr. Garg battles between life and death, and between right and wrong. During this fraught time the relationship between Victim 1 and Mr. Garg soured and led to a dispute in which the parties all wanted to break the lease, but no one wanted (or was able) to pay the nearly $10,000 in penalties for doing so.

This led to an argument before the management of the apartment building in July 2019. At that meeting, Victim 1 apparently learned that if there were a protective order, an individual could withdraw from the lease without penalty. Victim 1 filed a protective order, which stated that:

> ☑ Other. The building stated that if I was to get a restraining order I'd be able to move out of the residence (wouldn't be able to afford on my own)
> Protection involving a minor. *confidential* (reference to (5) above)

*See* Petition for Protection Order July 2, 2019
Def Ex. 19
.

Later expanding in the statement:

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

"my roommates Sumit Garg and Lindsay are refusing to pay [sic] share of agreed rent because I asked that we keep our expenses separate and that I [Victim 1] wasn't going to pay for goods they purchased for their own use.

Sumit Garg has said out loud that he knows that there's nothing I [Victim 1] can do because I'm the one who's responsible for paying the rent. (The building requires amount to be paid in full and from only one account). I'm the primary lease holder.

Sumit Garg screamed in my face and I fear he was going to harm me physically today, calling me various different names like crazy bitch, saying I have a mental disorder, belittling and inflicting emotional abuse.

I have had to block (on every communication outlet) both Sumit Garg and Lindsay Garg (previously Hefton) because they were both harassing me and calling me horrible names making me feel physically unsafe in my own apartment.

The building managers have been aware for months on the roommate situation and have wished they could help but due to the building policy I cannot get out of lease w/o paying $9958.80.

I went to the front desk this morning to discuss my options with the manager and she recommended I file a restraining"

<em>See</em> Petition for Protection Order July 2, 2019<br>Def Ex. 19

.

From Mr. Garg's perspective, Victim 1 used the legal process to address what was at heart a roommate dispute (refusing to pay rent because expenses were unfairly shared). Although this action by Victim 1 appears to her and to her family as merely an act of resolving a roommate dispute – a difficult and unhappy living situation – to Mr. Garg, this was an unmitigated catastrophe. *See e.g.*, USA_00053799. These allegations, to Mr. Garg so carelessly levied against him for the most routine of disputes, also meant that it threatened his ability to find work to support his wife, who at that very time had just begun treatment for cancer (USA_000013040). Although perhaps legal analysis could

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 9

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

point to a different conclusion, to Mr. Garg in July 2019, his ability to remain in the United States was in doubt, his ability to work and support his wife during her cancer treatment was under attack – in short, that everything that had been working in his favor was now in jeopardy.

It did not help that Mr. Garg viewed himself as a lowly immigrant, whose status was constantly in jeopardy. He was a boy who grew up in a poor village in India, in contrast to Victim 1 who came from a white, wealthy world in which her uncle, Victim 2, exuded power and privilege as a successful lawyer and former federal prosecutor. To Mr. Garg this was a struggle between the powerful—Victim 1 and those aligned with her—and the weak; the struggle to keep his world, family and future together. It was the powerful who could access the courts for their benefit, and it was the weak who struggled without work while juggling the stress of cancer and chemotherapy who could not easily afford the attorneys and fees that are required to navigate the civil courts.

However, the final straw was that after months of looking for work, Mr. Garg had finally found a high paying job. This occurred during COVID, and thus the job, like all jobs at that time, was remote. It is true that as part of the resolution for Victim 1's petition against Mr. Garg, Mr. Garg had agreed to stay away from Victim 1. However, given the fact that employment was remote, and the employer was a large corporation in which any contact with Victim 1 was remote and could be mitigated, Mr. Garg felt that this was an opportunity he should be able to pursue. In August 2019 Mr. Garg contacted an attorney to speak with Victim 1's attorney, Victim 2, who responded with sternly worded email

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 10

that Mr. Garg viewed as refusing him "employment at a worldwide company". *See* 20200629-124056-0004412. Mr. Garg felt squashed by the powerful.

The evidence from trial demonstrates that after this point he took on, or took part in, the campaign of cyberstalking emails that led to his final arrest by the United States in March 2021. During that period Mr. Garg took part in expanding the campaign to include not only Victim 1 and Victim 2, but also Victim 3 (her boyfriend), as well as Victim 4 (the investigating officer) and victim 5 (the prosecutor for the state who had the initial charges).

### c. Mr. Garg's Offense Conduct Is No Different Than The Typical Cyberstalking Offense.

The acts for which Mr. Garg is to be sentenced are serious. They include serious and vile threats. The loss of safety and security that Victim 1 outlines in her victim impact statement should not be discounted nor undermined. However, the very heart of a cyberstalking case is the type of loss of safety and security that Victim 1[4] outlines in her victim impact statement. In order to commit the crime of cyberstalking, it is necessary that the victim be placed in "reasonable fear of the death of, or serious bodily injury to" themselves or an immediate family member. 28 U.S.C. § 2261A. If there was no fear by the victim, there could be no crime. Consequently, the fact that a victim felt the very fear

---

[4] Counsel focuses on Victim 1 because only three victims provided impact victim statements. Victim 2 drafted a detailed and skillfully argued memorandum seeking a multi-decade sentence for Mr. Garg but does not describe the type of harm in the statute except as how it applies to others, in particular Victim 1. Likewise, Victim 3 provides a description of some harm but again focuses the impact on Victim 1. Counsel means no disrespect to those victims, but merely seeks to focuses the Court's attention on the issue of the statute. Victim 4 and 5, both participants in the criminal justice system, provided no statements.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 11

that is charged in the offense should not be a basis for elevating Mr. Garg's sentence into the exponential sentences advocated by the Government and probation.

For example, in *United States v. Kathy Hendrickson*, 21-CR-0032 U.S. Dist. MT, the defendant was found guilty after trial of cyberstalking in violation of 18 21 U.S.C. 2261A by engaging in a multi-year campaign against a former love interest by sending multiple threats through different emails account which ultimately expanded to death threats to County Commissioners, and a death threat to the Governor. *See* Dkt 43, Government's Trial Brief. Although the defendant threatened county commissioners and the governor, the Government did not seek any enhancements for government officials. There the Government sought a sentence of only 60 months and the Court ultimately sentenced the defendant to 52 months noting that she had two prior convictions for cyberstalking.

In another cyberstalking case, *United States v. Brandon Fleury*, 19-60056 from the Southern District of Florida, the defendant was charged with making interstate threats and cyberstalking against the victims of the Parkland school shooting. Dkt 1, Complaint. The defendant attempted to hide his role by creating fake accounts, but through IP analysis the Government was able to determine that Fleury was behind the threats. *Id.* The defendant sent statements such as "I killed your loved ones, hahahah", "with the power of my AR-15, I erased this existence"; "I took Jamie away from you. You'll never see her again hahahaha"; "I'm your abductor…I'm kidnapping you fool"; "with the power of my AR-15, you all die". *Id.* There the defendant went to trial and lost. The Government sought a 240-month sentence based on the trauma to the victims' family

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 12

(impersonating serial killers of dead children to their parents). There it was noted that "the maximum sentence that anyone has ever gotten for this guideline of 2A6.2 in a criminal history category of I [] is 137 months. That's the most that anyone's ever gotten for this." Dkt 185, p 160, Sentencing Transcript. The Court ultimately sentenced the defendant to just 62 months, noting that "we cannot sentence Mr. Fleury for what could have been. We cannot sentence the defendant for what might have been done. We must sentence the defendant for what he has done." *Id.*

In *United States v. Joshua Bale*, 20-0090 JCC, this Court sentenced the defendant to time served. In that case, Mr. Bale sent threatening emails to a former love interest for more than two years, including threats such as "I'm going to kill you and your whole family"; "I'm going to murder you. I swear it"; "I swear to go I will end your life. Sooner or later I will come to Australia and HUNT you down like an animal and finish you." Dkt 121, Plea Agreement. According to the Government, Mr. Bale embarked on a multi-year campaign against his former love interest to "punish" her for breaking his heart. Dkt 131, Government Sentencing Memorandum.

> "And for two years, that is exactly what he did. He sent hundreds of emails ridiculing, insulting, and intimidating her, including through racial epithets demeaning her cultural background and intelligence. He threatened to kill her, sometimes in graphic detail. He disparaged her in emails and letters sent to faculty at her university, her parents, and her father's work colleagues. He threatened to publicize nude photographs of her, taken without her consent, and then created offensive fake Instagram profiles in her name using some of those photographs."

> *Id.*

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 13

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

Mr. Bale was confronted by Government officials and told to stop, and he did not – only after a federal prosecution did he stop. *Id.* All the parties agreed to a time served sentence, and this Court sentenced Mr. Bale to time served.

## II.   The Guidelines Are Not Reliable And Thus Should Not Be The Basis To Sentence Mr. Garg.

Both the Government's request for 180 months and Probation request for 168 months base their argument on the Guidelines. As already noted, the Supreme Court states that the law does "not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *See e.g.*, *Nelson v. United States*, 555 U.S. 350, 352, 129 S. Ct. 890, 892, 172 L. Ed. 2d 719, 2009. As such, aside from the claim that such a sentence meets the requirements of 18 U.S.C. § 3553(a), there is nothing in their arguments that supports such a sentence. The Supreme Court has stated, repeatedly, that each "convicted person [is] an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) *quoting Koon v. United States*, 518 U.S. 81, 113 (1996)

Looking at Congress's intent, Congress limited the maximum sentence for a violation of 18 U.S.C. § 2261A to 5 years. 18 U.S.C. 2261. If serious bodily injury to the victim or if the offender used a dangerous weapon, the maximum increases to 10 years. *Id.* If permanent disfigurement applies, the maximum doubles to 20 years and if death results, the maximum is life. *Id.* Thus, the framework from Congress provides an ever-increasing level of punishment depending on the severity of the impact on the victim, not

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 14

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

individual characteristics of the offender nor the number of threats or the overall time period. *Id.* Here, thankfully, none of the other maximum sentence criteria applies and the stated injury from Victim 1 is the fear that she felt from Mr. Garg's campaign which is an element of the offense.

The Guidelines provide no basis for this Court because the Commission created arbitrary numbers for the offense; there is nothing in the record to support a base offense level of 18 rather than 14, 12 or 30. There is no empirical basis for enhancing Mr. Garg from what would be a guideline offense of 18 CHI, which recommends a sentence of 27-33 months for Mr. Garg's criminal conduct to a sentence that is more than 600% higher than the base offense and to a sentence that is longer than sentences for rape, some forms of homicide and assault. The results are absurd and by attempting to create a numerical system the guidelines, at least in this case, have made a mockery of the Court's solemn obligation to sentence an individual for his crime.

The absurdity of the guidelines is also underscored by the fact that the very enhancements that the Government seeks to use to give Mr. Garg a sentence that is nearly 10 times the median sentence for cyberstalking is underscored that the enhancements are not reliably applied. For example, in the *Hendrickson* case cited *supra*, the defendant clearly threatened city commissioners and the governor, but the Government did not seek nor was a guideline enhancement for official victims applied. Importantly, that case was, as here, a trial case, so the claim that these are negotiated away during plea negotiations is undermined. In *Bale,* discussed *supra*, the defendant embarked on a multi-year campaign to make his ex-love life's interest miserable, including years of threats, fake

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 15

online accounts, threats to reveal nude photographs and sent emails and letters to her school and employers. Yet, Mr. Bale had no enhancements – not even a modest adjustment for "a pattern of activity involving stalking, threatening, harassing or assaulting the same victim." If the Guidelines are not uniformly enforced, then the Guideline cannot be the basis for a fair sentence since it permits the Government to chose when to apply enhancements and when it chooses to not have those enhancements apply.[5] However, even *if* these enhancements are negotiated by plea agreements, is it a fair sentence if a sentence is increased based on the increases in Mr. Garg's sentence when that sentence is not just a bit longer, but several ***times*** longer – on what empirical basis is that made on? There is not one. The Guidelines provide no empirical basis, and this Court should reject the Guidelines in their entirety.

### III.    A 48 Month Sentence Is A Sentence That Meets All The Requirements Of 18 U.S.C. § 3553(a).

Although the Guidelines must be correctly calculated, this Court owes it no deference.[6] Rather, the Court is directed to give a sentence that is sufficient but not greater than necessary to 1) reflect the seriousness of the offense, by promoting respect for the law and to provide just punishment for the offense, 2) afford adequate deterrence to

---

[5] Counsel has done his best to make this point, but the available record is limited since the defense does not have access to the PSI for all similarly situated defendants. Counsel will note that as counsel for record for a defendant who was charged with making online threats, the relevant conduct section stated that the defendant made online threats to kill law enforcement officers, but no enhancement was ever sought nor applied.

[6] This position is further underscored by the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, No. 22-1219, 2024 WL 3208360, at *12 (U.S. June 28, 2024) which held that courts may not defer to agency decisions. Rather, the Court declared the "elemental proposition reflected by judicial practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment. It specifies that courts, not agencies, will decide "all relevant questions of law" arising on review of agency action".

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 16

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

criminal conduct and 3) to protect the public from further crimes of the defendant. Thus, the question is how long of a sentence is necessary to punish Mr. Garg, to deter others, and to protect the public from Mr. Garg.

### a. Sentence Of 48 Months Is A Sentence That Reflects The Seriousness Of The Offense, Promotes Respect For The Law, And Provides Just Punishment For The Offense.

A sentence of 48 months is a significant sentence, particularly for an individual who has no prior criminal history and will have numerous collateral consequences because of his conviction. *See, e.g.*, *United States v. Paul*, 561 F.3d 970 (9th Cir. 2009) (a guideline sentence can be unreasonably high where a defendant has a limited criminal record); *United States v. Rodriguez*, 322 F. Supp. 3d 907, 910 (E.D. Wis. 2018) ("[G]enerally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend.").

//

//

//

//

//

//

//

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 17

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

A 48-month sentence is a sentence significantly higher than the average and median sentence for all offenders with a criminal history score I, under the stalking statute 2A2.2 of the guidelines. *See* United States Sentencing Commission Data Analyzer for 2021,2022, 2023 for stalking, CH I *available at* https://ida.ussc.gov/analytics/saw.dll?.



**Average and Median Sentence Length**
Fiscal Year 2021,2022,2023

The figure includes the 115 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2021,2022,2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Stalking/Harassing; Guideline: §2A6.2; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

Thus, such a sentence is above but not absurdly higher than similarly situated defendants. Even adding on enhancements for the myriad misconduct alleged by the Government does not take this case and make it the worst case of cyberstalking in United States history. See e.g., *Fleury supra,* noting that the highest possible sentence recorded is *less* than what Probation and the United States seek.

Moreover, such a sentence is in line with similarly situated defendants. Below is a list of similarly situated defendants that the defense provided to Probation and the United States. In its rational for its sentencing, Probation conspicuously fails to mention

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 18

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

any similarly situated defendants in its recommendation and does not refute or attempt to differ the following cases:

| Kathy Hendrickson | MT | 21-0032 | Trial | 48 months |
|---|---|---|---|---|
| Frank Sweeny | ID | 19-0089 | Plea | 51 months |
| Cameron Shea | WA | 20-0032 | Plea | 36 months |
| Kaleb Cole | WA | 20-0032 | Trial | 84 months |
| Taylor Ashley Parker-Dipeppe | WA | 20-0032 | Plea | Time served |
| Johnny Garza | WA | 20-0032 | Plea | 16 months |
| Eric Kikkert | WA | 22-0053 | Plea | Time served |
| Robert Waldman | SD NY | 18-0424 | Plea | 50 months |
| Shaw Sayer | ME | 11-0013 | Plea | 60 months |
| Dean Humphries | SD NY | 12-0347 | Trial | 24 months |
| David Ackell | NH | 17-1784 | Trial | 33 months |
| Ho Ka Terence Young | DE | 17-0014 | Plea | 46 months |
| Brandon Fluery | SD FL | 19-60056 | Trial | 66 months |
| Anthony Robinson | ND MS | 19-0099 | Trial | 33 months |
| Charles Nagel | EDNY | 10-511 | Trial | Probation |
| Thomas Traficante | WDNY | 18-6034 | Plea | 48 months |
| Joshua Bales | WA | 20-0090 | Plea | Time served |

Of these defendants, all of whom were convicted for violation 18 U.S.C. § 2261A specifically, or the in the case of the Cameron Shea cases, for conspiring to violate 2261A, not a single defendant is even remotely close to the sentence sought by the United States and Probation. Why is Mr. Garg's punishment worth a sentence that is 150 months longer than Mr. Bale who, by all available records, committed a similar offense? Why is Mr. Garg's sentence worth an additional 102 months more than Mr. Fleury who impersonated mass murders to the family of the victims of a school shooting? Why is Mr. Garg's sentence worth an additional 10 years compared to Ms. Hendrickson, even though

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

she also engaged in a multiple year campaign of death threats, including to county officials and the governor? Importantly, that was Ms. Hendrickson's THIRD conviction for cyberstalking. The recommendations by the United States and Probation are completely disconnected to the crime and to the defendant.

Rather a 48-month sentence is a sentence that is in line with similarly situated defendants. Since those sentences are also cyberstalking offenses, they are also sentences that reflect the seriousness of the offense, promotes respect for the law[7] and provides just punishment for the defense.

### b) A 48-month Sentence Provides Adequate Deterrence To Others.

A 48-month sentence provides deterrence to others. This is because deterrence is not driven by the length of a sentence but the likelihood of being caught and convicted. *See, e.g.,* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). This is because potential criminals are not generally

---

[7] Providing longer sentences does not promote just respect for the law. Research shows that those who believe that the criminal justice system is biased against them have little stake in the system and thus are actually more likely to offend. In *Unlocking America, Why and How to Reduce America's Prison Population*, the authors note that the "[f]ailure to limit the severity of punishment to what is deserved is unjust.  It alienates citizens from the government and undercuts the effectiveness of law enforcement." (JFA Institute, November 2007) at page 20 (found at http://www.jfa-associates.com/ publications/srs/ UnlockingAmerica.pdf); see also Lynne M. Vieraitis et al., *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 591-93 (2007) ("imprisonment causes harm to prisoners," isolating them from families and friends, making it difficult to successfully reenter society, and "reinforc[ing] criminal identities" through contacts with other criminals); Miles D. Harer, Do Guideline Sentences for Low-Risk Drug Traffickers Achieve Their Stated Purposes?, 7 Fed. Sent'g Rep. 22 (1994) ("[T]he alienation, deteriorated family relations, and reduced employment prospects resulting from the extremely long removal from family and regular employment may well increase recidivism."). As Dr. Martin Luther King stated, "prison doesn't make better people but instead it makes bitter people."

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 20

**VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800**

aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences as one might expect of rational decision-makers. Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006). One report concluded that "[t]here is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

Another problem with justifying punishment as a means of deterring others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote the deterrence of others.

> "Juridical punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another."

> Immanuel Kant, The Science of Right 195
> (W. Hastie trans., 1790).

To the extent that this case is followed by potential offenders, a sentence of 48 months will provide deterrence. A multi-year sentence, particularly with the collateral consequences that Mr. Garg will face in addition to his prison sentence, is a serious sentence.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 21

### c. There Is No Basis To Extend Mr. Garg's Prison Sentence Based On A Belief That He Needs To Be Incapacitated.

Mr. Garg is a first-time offender. Although his offense lasted for several months, there is nothing in the record of Mr. Garg or in this offense that warrants a lengthy sentence based on what the Court believes what he *might* do. Mr. Garg is a highly functioning person who lived in the community for more than 30 years without issue. There is no allegation that Mr. Garg has ever acted this way toward anyone in the past. There are no allegations that he acted improperly during his education and no allegation that he did anything improper during his employment. In short, there is *nothing* in the record to support an argument that Mr. Garg needs to be incapacitated.

## IV. The Nature And Circumstances of Mr. Garg Warrant A 48-Month Sentence Because In Addition To Mr. Garg's Personal Qualities, Mr. Garg Will Continue to Feel the Impact Of His Conviction Long After Any Sentence Is Complete.

As noted above, Mr. Garg is a first-time offender who, during a mental health breakdown in response to his wife's cancer diagnosis, perceived Victim 1's actions (and those of her supporters) as using their power to deprive him of all he had worked for in his life. All evidence supports this as a momentary lapse by Mr. Garg's otherwise lawfully abided by life. Mr. Garg has made great strides in understanding his mental health challenges and as the report by Dr. Solchany underscores, it is a process that Mr. Garg began long before he was arrested. However, the unique set of circumstances that led Mr. Garg to this Court is unlikely to ever reappear. However, there are numerous collateral consequences that make a 48-month sentence appropriate.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 22

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

### a. Mr. Garg Will Be Continually Punished Long After His Prison Sentence Because His Ability To Work In His Industry Is Likely Forever Closed.

Prior to this offense, Mr. Garg was making and on the precipice of earning high amounts in the tech sector. Straight out of college Mr. Garg was able to land a job that paid more than six figures and, as a tech-oriented businessperson, his earning potential was unlimited. This was a remarkable feat for a boy who started off in a poor village in India. The pride was not only in Mr. Gar's world, but in that of his entire family. However, with his cyberstalking conviction, Mr. Garg is unlikely ever to find similar employment. For many offenders, the lack of employment opportunities is the genesis for their crime. For Mr. Garg, the opposite is true. The employment opportunities that he has worked decades of his life to obtain will now be foreclosed to him. This is a serious consequence that the Court should consider when determining his sentence and is why a sentence of 48-months is a significant and serious sentence for Mr. Garg.

### b. Mr. Garg Faces Deportation Back To A Country That Mr. Garg Had Left Almost A Decade Ago.

Although as standby counsel, the undersigned does not know the exact perimeter of Mr. Garg's immigration consequences, it is presumed that Mr. Garg will face deportation once this offense is complete. PSI ¶ 109. Deportation is a punishment that will follow Mr. Garg for the rest of his life. With his conviction not only will Mr. Garg face deportation, but once deported Mr. Garg will be barred from returning to the United States. Once deported, his ability to go to any other western country where he could use his skills and education are also foreclosed.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 23

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

As Judge Weinstein remarked in *United States v. Chong*, No. 13-CR-570, 2014 U.S. Dist. Lexis 135664, 2014 WL 4773978, at *4 (E.D.N.Y. Sept. 24, 2014), "even without a lengthy term of incarceration, defendant will be adequately punished for his wrongdoing by his expulsion from the United States...The unique and manifold challenges the defendant will face in a foreign country upon completion of his sentence supply special grounds for minimizing the destructive effects of incarceration and for accelerating the rehabilitation process outside of prison." In imposing "just punishment" for a particular offense, a sentencing judge should not ignore the additional penalties and hardships that will attach as a result of conviction. *See* Hugh LaFollete, Collateral Consequences of Punishment: Civil Penalties Accompanying Formal Punishment, 22 J. of Applied Phil. 241, 244-46 (2005); *Jordan v. De George*, 341 U.S. 223, 232 (1951) (Jackson, J.) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts."); *Lyons v. Pearce*, 298 Or. 554, 565, 694 P.2d 969, 977 (1985) ("A deported alien may be required to sever family ties, become impoverished and return to a society in which he no longer can function and may, indeed, face life-threatening conditions. It portends drastic consequences in many cases. It is in all cases a life sentence of banishment").

### V.    *Those Who Know Mr. Garg Best Know Him As A Good Man Deserving This Court's Leniency.*

Attached to this memorandum are three dozen letters from all all parts of the world. Exhibit B. These include not only his family and friends, but also many who spent time with Mr. Garg while incarcerated.  This demonstrates that not only is Mr. Garg's

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 24

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

connections and good character known by his family and friends, but also to the many people he has met during his time at The FDC.

In addition to the dozens of letters, Mr. Garg's parents have made a plea for leniency to the Court. It is accessible through the following link:



I am Sumit's mother, Nirmal Garg, living in Delhi.

https://www.dropbox.com/scl/fi/9r1aae9r50il7yvwn9lu1/Mercy-Plea-Final.mp4?rlkey=z7ha7yy50yuxj01y2r4px1wu8&st=ywhpwl5b&dl=0

**Conclusion**

WHEREFORE, Mr. Garg requests this Court to sentence him to 48 months. Mr. Garg is a first-time offender whose involvement is the direct result of his mental health conditions combined with the stress of his wife suffering from cancer, the added stress of losing his job, and the final stressor of the perceived use of the legal system to deprive Mr. Garg from all that he held dear.

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 25

VITEK LAW LLC
1700 SEVENTH AVE,
SUITE 2100
SEATTLE, WA 98101
206.673.2800

Probation recommends a 168-month sentence, but such a sentence is vastly outside the types of sentences imposed for cyberstalking and would likely be the longest ever sentence imposed by any court in the United States for such an offense. Such a punishment goes against the very type of individualized sentencing that the Courts are directed to impose when sentencing individuals and merely underscore why the Guidelines provide no guidance for the Court in sentencing Mr. Garg. Rather, given that similarly situated defendants received sentences much less than 48 months, such a sentence recognizes the pain his actions caused Victim 1, but tempers the sentence in recognition of Mr. Garg's individual struggles and overall good character.

In short, a sentence of 48 months is a sentence that meets all the requirements of 18 U.S.C. § 3553(a) and should be the sentence of this Court.

Respectfully submitted this 2nd day of July 2023.

s/ Nicholas Vitek
Nicholas J. Vitek
Attorney for the Defendant
Vitek Law LLC
1700 Seventh Ave, Suite 2100
Seattle, WA 98112
Tel: 206.673.2800
Fax: 206.408.6823
vitek@viteklaw.com

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 26

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**

DEFENDANT'S SENTENCING MEMORANDUM
(USA v. SUMIT GARG, CR 21-0045.) - 27

**VITEK LAW LLC**
**1700 SEVENTH AVE,**
**SUITE 2100**
**SEATTLE, WA 98101**
**206.673.2800**